# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-1117

———————

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Eastern District of Arkansas. |
| Geff Yielding, | * |
| | * |
| Appellant. | * |

———————

Submitted: March 15, 2011
Filed: October 5, 2011 **(Corrected 10/7/11)**

———————

Before LOKEN and COLLOTON, Circuit Judges, and NELSON,[1] District Judge.

———————

COLLOTON, Circuit Judge.

A jury found Geffrey A. Yielding guilty of two federal offenses: one count of aiding and abetting a violation of the so-called Medicare anti-kickback statute, in violation of 42 U.S.C. § 1320a-7b(b)(2) and 18 U.S.C. § 2, and one count of aiding and abetting the falsification of a document, in violation of 18 U.S.C. §§ 1519 and 2. The district court imposed concurrent sentences of 60 months' imprisonment for the anti-kickback conviction and 78 months' imprisonment for the document falsification

---

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota, sitting by designation.

conviction, to be followed by three years of supervised release. The court also ordered Yielding to pay $944,995.84 in restitution. We affirm Yielding's convictions, vacate the sentence due to procedural error, and remand for further proceedings.

I.

In approximately 1998, Yielding began to work as a surgical and administrative assistant for Dr. Richard Jordan, a neurosurgeon in North Little Rock, Arkansas. Dr. Jordan performed surgeries at several area hospitals, including Baptist Health Medical Center in North Little Rock ("Baptist"). Yielding was responsible for ensuring that the required equipment was present at all of Dr. Jordan's surgeries.

Jordan "Jody" Wall was a charge nurse at Baptist in 2003 and 2004. He was responsible for ordering medical supplies for Dr. Jordan's surgeries at that hospital. Yielding told Wall which supplies were needed for each scheduled surgery, and Wall ensured that the requested items were available. When Baptist did not have enough supplies on hand, Wall asked Denise Rhodes, the hospital's senior inventory coordinator, to order the needed items.

In 2002, Yielding's wife, Kelley Yielding, incorporated Advanced Neurophysiology, Inc. ("ANI"), a medical services company of which she was the sole shareholder. By 2003, Kelley had begun to work as an independent sales agent for two medical supply companies known as Orthofix and Osteotech. Orthofix sold external bone growth stimulators, which promote bone growth following surgery in patients who would otherwise have difficulty growing new bone. Osteotech sold bone allograft, which is substitute bone that is used to fill a void in a patient's bone after surgery or trauma.

Kelley Yielding marketed the two companies' products to surgeons, and received commissions on each sale. From February 2003 to October 2004, Kelley

received approximately $384,000 in commissions from Osteotech and Orthofix that were attributable to purchases by Baptist. During the same period, ANI issued twenty-two checks to Wall totaling $54,366.08.

In November 2004, Baptist terminated Wall and Rhodes after an internal investigation revealed irregularities in the ordering of Osteotech bone and Orthofix bone growth stimulators. Baptist determined that Rhodes had placed purchasing orders for the Osteotech and Orthofix products without proper authorization, and that the hospital should not have purchased any Orthofix bone growth stimulators. Baptist also discovered that more than one hundred pieces of bone were missing from the hospital's inventory.

On December 27, 2004, Dr. Jordan forwarded to the Yieldings an e-mail he had received from a Baptist administrator. In the e-mail, the administrator characterized the purchases of the bone growth stimulators as "very suspicious," and informed Dr. Jordan that the hospital was "continuing [its] investigation of this issue as well as the . . . missing pieces of bone."

Three days later, U.S. Bank issued a check to ANI for $34,018.90. This was the precise amount of ANI's total payments to Wall in 2004. The check listed the remitter as Jordan Wall, and the purpose of the payment as "REPAYMENT ON LOAN." Bank records showed that on the same day, Yielding withdrew $21,018.90 from the Yieldings' personal bank account at U.S. Bank. A receipt and currency transaction report indicated that Yielding also paid the bank $13,000 in cash.

The Federal Bureau of Investigation opened an inquiry into the irregularities at Baptist in mid-2005. In an interview in October 2005, Wall told investigators that the Yieldings had given him a loan of "[m]aybe $10,000," not the $34,018.90 paid by check in December 2004. On April 14, 2006, the FBI executed search warrants at the Yieldings' home and at Dr. Jordan's office. During the search of the Yielding

residence, the agents discovered a promissory note describing an interest-free loan of $34,018.90 issued from ANI to Wall in January 2004. The note was marked as paid on December 30, 2004.

The agents also interviewed Kelley Yielding. She initially described the payments from ANI to Wall as a loan and denied that Wall had been employed by ANI. Yielding told the agents that he and his wife had given Wall a loan of approximately $30,000, that the loan had been documented, and that Wall had repaid the loan. After the agents confronted Yielding with bank records indicating that he used his own funds to purchase Wall's check to ANI, however, Yielding stated that Wall had convinced him to pay Wall approximately $3000 per month in exchange for Wall's promise to keep all of Kelley Yielding's supplies fully in stock. Yielding told the agents that Wall asked him to purchase a cashier's check to make it appear as if the payments to Wall had been a loan that Wall was paying back. On the same day, the FBI again interviewed Wall, who then admitted that he had received payments from the Yieldings in exchange for ordering Osteotech bone and Orthofix bone growth stimulators.

Kelley Yielding died on October 2, 2006. Wall entered a plea agreement with the government in 2008. On May 8, 2008, a grand jury indicted Yielding on forty-six counts of mail fraud, falsification of documents, and payment of kickbacks involving a federal health care program. A superseding indictment was filed on November 5, 2008, and a two-count second superseding indictment was returned on February 4, 2009.

At trial, the government presented testimony from FBI agents, Osteotech and Orthofix managers, and current and former Baptist employees. Wall testified that Yielding had approached him and had offered to pay him in exchange for ordering the products sold by Kelley Yielding. According to Wall, Yielding gave Wall lists of items to order, and Wall then asked Rhodes to obtain the listed supplies. Wall recalled

that Yielding once told him to order some bone products so that Kelley would qualify for a free vacation. In return for Wall's efforts, Yielding gave him envelopes containing checks from ANI. Wall testified that Yielding told him to "keep it quiet," and asked him in approximately December 2004 to sign and date a promissory note so that the note would appear to have been signed in January 2004. Wall said that Yielding also asked him to sign a cashier's check that would make the payments from ANI to Wall look like a loan.

The government also presented testimony concerning Yielding's past employment. Cary Hagan, the owner of a medical device distributorship named Medex, Inc., explained that his company employed Yielding for about two years in the mid-1990s. Hagan testified that he terminated Yielding after discovering that Yielding had misappropriated $4000 – the amount of Yielding's regular monthly pay – from the distributorship's bank account while Hagan was out of town. Hagan's wife Julie Hagan, who worked as the distributorship's bookkeeper, confirmed this account and testified that she found a $4000 check from the distributorship to Yielding on which her husband's signature had been forged. In a similar vein, the government called as a witness Daniel Fry, a former assistant to Dr. Jordan, who testified that Yielding was in charge of processing payments at Dr. Jordan's office in the late 1990s. Fry discovered that roughly $28,000 in payments from insurance companies and patients were marked as received by Dr. Jordan's office, but had in fact been diverted from Dr. Jordan's accounts into a separate bank account listed under the names of Dr. Jordan and Yielding. Fry testified that Dr. Jordan was "upset" when informed of the missing funds, and that Yielding took a leave of absence following a meeting with Dr. Jordan about the irregularities.

The jury convicted Yielding on both charges. At sentencing, the district court calculated an advisory guideline range of 78 to 97 months' imprisonment. The court sentenced Yielding to 60 months' imprisonment on the first count of the indictment, and 78 months' imprisonment on the second count, to run concurrently, and to a three-

year term of supervised release. The district court also ordered Yielding to pay $944,995.84 in restitution.

## II.

Yielding first argues that the district court erred in admitting testimony concerning statements made by Kelley Yielding during her interview with the FBI on April 14, 2006. Over Yielding's objection, the district court permitted the following testimony from one of the FBI agents who interviewed Kelley:

> Q: Did you ask Kelley Yielding about the monies that she, through ANI, had paid to Jody Wall?
> A: We did.
> Q: What did Ms. Yielding tell you about those payments?
> A: She acknowledged the payments and she expressed to us that they were a loan provided to Mr. Wall. . . .
> Q: Okay. Did you ask her who made that loan?
> A: I don't know if we asked her specifically, but it was – during the interview it was discussed as a "We gave him a loan," leading us to believe it was her and her husband, Mr. Geffrey Yielding.
> Q: Did you ask her whether Jody Wall had ever been employed by ANI?
> A: We did.
> Q: What was her response?
> A: She said no and not in any capacity.

Yielding asserts that this testimony was inadmissible hearsay and that it violated his rights under the Confrontation Clause of the Sixth Amendment. Yielding challenges two aspects of the testimony: the report of Kelley Yielding's statement that the payments to Wall were a loan, and the report of her statement that Wall was never employed by ANI. We review a district court's evidentiary rulings for abuse of

discretion, but Confrontation Clause objections are considered *de novo*. *United States v. Watson*, No. 11-1169, 2011 WL 3568918, at \*2 (8th Cir. Aug. 16, 2011).

The admission of the agent's testimony about a supposed "loan" to Wall was not error, because the statement was not hearsay and not testimonial. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted*." Fed. R. Evid. 801(c) (emphasis added). But the government introduced the evidence about Kelley Yielding's characterization of the payments to Wall to demonstrate that she used a false "cover story" about a "loan," not to prove the truth of her assertion to the FBI. Statements are not hearsay when "the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false." *Anderson v. United States*, 417 U.S. 211, 219-20 (1974); *see also United States v. Neadeau*, 639 F.3d 453, 455 (8th Cir. 2011); *United States v. Weaver*, 565 F.2d 129, 135-36 (8th Cir. 1977); *United States v. Kelly*, 551 F.2d 760, 765 (8th Cir. 1977). The government introduced other evidence showing that the payments to Wall were kickbacks rather than loans, and emphasized during closing arguments that the payments to Wall were not loans. Because the statement was not used to establish the truth of the matter asserted, the evidence was not hearsay, and its admission also did not violate the Confrontation Clause. *See Michigan v. Bryant*, 131 S. Ct. 1143, 1160 n.11 (2011); *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).

Kelley Yielding's report that ANI never employed Wall, by contrast, was not offered for the purpose of establishing its falsity. The government agreed that Wall was not an ANI employee, and relied on this fact in closing argument. The government argues that the agent's testimony was admissible, because it was not introduced to prove the truth of the matter asserted, and because it was a declaration by a coconspirator. *See* Fed. R. Evid. 801(d)(2)(E).

We need not resolve those points, because we conclude that any error in the admission of the statement about Wall's employment status was harmless. An erroneous evidentiary ruling is harmless if it does not have a substantial influence on the outcome. *United States v. Lupino*, 301 F.3d 642, 645 (8th Cir. 2002). Violations of the Confrontation Clause do not require reversal if the error is harmless beyond a reasonable doubt. *United States v. Holmes*, 620 F.3d 836, 844 (8th Cir. 2010).

Yielding contends that the introduction of the statement prejudiced him by undermining his reliance on a statutory "safe harbor" under the anti-kickback statute. The anti-kickback statute's criminal prohibition provides, in relevant part, that:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony . . . .

42 U.S.C. § 1320a-7b(b)(2). The safe harbor provision states that this prohibition shall not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." *Id.* § 1320a-7b(b)(3)(B). The parties do not appear to dispute that the provision creates an affirmative defense. *See United States v. Job*, 387 F. App'x 445, 455-56 (5th Cir. 2010) (per curiam); *United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001) (per curiam).

Assuming that the defense was properly raised at trial, the agent's disputed testimony about Kelley's statement would not have made any difference in the outcome of the case. The government presented overwhelming evidence at trial that the payments to Wall were not part of a *bona fide* employment relationship. Wall

testified that he did not work for ANI and that the payments were bribes. An FBI agent explained that Yielding initially characterized the payments as a loan, but then admitted paying Wall to order items distributed by Kelley Yielding. Other testimony and financial records showed that Yielding engaged in an elaborate ruse designed to disguise the payments as a loan. *See United States v. Starks*, 157 F.3d 833, 839 (11th Cir. 1998). On this record, we conclude that admission of the disputed evidence did not have a substantial influence on the verdict and was harmless beyond a reasonable doubt.

## III.

Yielding also challenges the admission of evidence, under Federal Rule of Evidence 404(b), that Yielding stole funds from previous employers in the health care industry. In relevant part, Rule 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

The district court admitted testimony concerning Yielding's theft from Dr. Jordan in 1998 as relevant to Yielding's intent in this case, and allowed testimony about Yielding's theft from Cary Hagan in 1995 as relevant to knowledge and intent. The court determined that the probative value of the evidence outweighed its prejudicial effect, *see* Fed. R. Evid. 403, and concluded that any unfair prejudice could be cured by a limiting instruction. We review a district court's evidentiary rulings for abuse of discretion, and reverse "only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." *United States v. Cvijanovich*, 556 F.3d 857, 864 (8th Cir. 2009) (internal quotation omitted).

Evidence of other extrinsic acts is admissible under Rule 404(b) when it is: "(1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) supported by sufficient evidence; and (4) such that its probative value is not outweighed by any prejudicial impact." *United States v. Ruiz-Estrada*, 312 F.3d 398, 403 (8th Cir. 2002). "The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *Huddleston v. United States*, 485 U.S. 681, 686 (1988).

The testimony about Yielding's prior thefts showed that he used specialized financial knowledge to steal from employers in the health care industry and to cover up his actions by disguising them as legitimate activity. Yielding placed his state of mind at issue: he argued there was no evidence that he knew the promissory note signed by Wall was false, or that he intended his payments to Wall as an inducement to order products distributed by Kelley Yielding. The disputed evidence of prior acts was relevant to show that Yielding knew of the kickbacks and of the falsity of the promissory note, and to show that Yielding intended both to induce Wall to order Kelley's products and to use the promissory note to cover up the kickback scheme.

Yielding also argues that the prior thefts were too remote in time, noting that Yielding's alleged theft from Medex took place almost fifteen years before trial. There is no absolute rule about remoteness in time, and we apply a reasonableness standard based on the facts and circumstances of each case. *United States v. Edelmann*, 458 F.3d 791, 810 (8th Cir. 2006). This court has upheld the introduction under Rule 404(b) of fifteen-year-old convictions that were similar to the crime charged and demonstrated the same method of deception used in the case under review. *Id.* In this case, the prior acts of theft occurred within ten years of the charged conduct, and were highly probative of Yielding's knowledge and intent. Under these circumstances, the prior acts were not too remote in time.

We also reject Yielding's contention that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The evidence of Yielding's prior acts had substantial probative value on the issues of knowledge and intent. The district court minimized any prejudice to the defendant by giving the jurors a limiting instruction that directed them not to consider the evidence as proof of Yielding's character or criminal propensity, but only as proof of Yielding's knowledge, intent, and relationship with Dr. Jordan. *See id.* We therefore conclude that the admission of the Rule 404(b) evidence was not an abuse of discretion.

IV.

Yielding next argues that the district court erred in denying his motion to dismiss count one of the second superseding indictment, which charged a violation of the anti-kickback statute. Yielding contends that the charge was both duplicitous and barred by the statute of limitations. We review the denial of a motion to dismiss an indictment *de novo*. *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009).

A.

An indictment is duplicitous when it combines two or more distinct and separate offenses into a single count. *United States v. Nattier*, 127 F.3d 655, 657 (8th Cir. 1997). The "principal vice" of a duplicitous indictment "is that the jury may convict a defendant without unanimous agreement on the defendant's guilt with respect to a particular offense." *Id*. at 657 (internal quotation omitted). This risk can be cured, however, "by a limiting instruction requiring the jury to unanimously find the defendant guilty of at least one distinct act." *Id.*

The first count of the indictment alleged:

From in or about June 2003 through in or about December 2004, in the Eastern District of Arkansas and elsewhere, [Yielding] and others known to the Grand Jury, aiding and abetting one another, knowingly and willfully paid Jody Wall the following remuneration, namely checks from [ANI], portions of which were for the purpose of inducing Wall to arrange for the order and purchase of bone from Osteotech and bone growth stimulators from Orthofix, items for which payment may be made in whole or in part under a Federal health care program.

This sentence is followed by a list of eighteen checks paid to Wall on separate dates between June 2003 and December 2004, and the allegation that Yielding's conduct was in violation of the anti-kickback statute and 18 U.S.C. § 2. Yielding argues that count one was duplicitous and prejudicial, because "there was no guarantee that the jurors who convicted Yielding were unanimous in finding any one of the alleged payment inducements."

Assuming for the sake of argument that count one of the indictment was duplicitous, the district court's limiting instruction cured any potential prejudice to Yielding. The district court instructed the jury that:

It is not necessary that the government prove beyond a reasonable doubt that more than one payment as alleged in Count 1 was made. It is sufficient if the government proves beyond a reasonable doubt one such payment; but in that event, in order to return a verdict of guilty, you must unanimously agree upon which payment was made. If you cannot agree in that manner, you must find the defendant not guilty of the offense charged in Count 1.

This instruction closely tracks limiting instructions that we have approved for an identical purpose, *see Nattier*, 127 F.3d at 658; *United States v. Karam*, 37 F.3d 1280, 1286 (8th Cir. 1994), and it was sufficient to resolve any potential duplicity concerns by requiring the jury to agree unanimously on a particular payment.

Yielding contends in the alternative that this instruction "abrogated" all elements of the offense except the requirement that the government prove a "payment," a misstep that he deems "so patently erroneous that it needs no citation of authority." The clarity of the alleged error is lost on us. The limiting instruction merely described how the jury should approach one element of the offense; it did not relieve the jurors of their obligation to find that the government had proven each element of the offense beyond a reasonable doubt.

Yielding also claims a violation of his right to indictment by a grand jury under the Fifth Amendment. His theory is that count one of the second superseding indictment "should have been dismissed on duplicitous grounds as there was no way for Yielding to know whether a majority of the grand jury found that any one of the alleged payment inducements constituted an offense." The second superseding indictment, however, alleges that portions of *all* of the listed payments were made for the purpose of inducing Wall to order products distributed by Kelley Yielding. The return of the indictment thus shows that a majority of grand jurors found probable cause to believe that *all* of the payment inducements constituted an offense. *See* Fed. R. Crim. P. 6(f).

B.

The "general 'catchall' federal criminal statute of limitations," 18 U.S.C. § 3282(a), establishes a five-year limitations period for non-capital federal offenses. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 155 (1987). Yielding does not dispute that the original indictment was filed within this limitations period. He asserts, however, that several of the payments alleged in count one of the second superseding indictment occurred more than five years prior to the filing of that indictment on February 4, 2009, and that charges based on these payments are thus barred by the statute of limitations.

-13-

For limitations purposes, "a superseding indictment filed while the original indictment is validly pending relates back to the time of filing of the original indictment if it does not substantially broaden or amend the original charges." *United States v. Hance*, 501 F.3d 900, 905 (8th Cir. 2007) (internal quotation omitted). An original indictment remains pending prior to trial, even after the filing of a superseding indictment, unless the original indictment is formally dismissed. *United States v. Walker*, 363 F.3d 711, 715 (8th Cir. 2004); *see* Fed R. Crim. P. 48. Because the original indictment in this case was still pending at the time the second superseding indictment was filed, the second superseding indictment "relates back" to the time of filing of the original indictment for limitations purposes, so long as it does not "substantially broaden or amend the original charges." *Hance*, 501 F.3d at 905.

To determine whether a superseding indictment substantially broadens or amends a pending timely indictment, we agree with other courts that it is appropriate to consider "whether the additional pleadings allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence." *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003). The "touchstone" of this analysis is whether the original indictment provided the defendant with fair notice of the subsequent charges against him. *United States v. McMillan*, 600 F.3d 434, 444 (5th Cir. 2010); *United States v. Munoz-Franco*, 487 F.3d 25, 53 (1st Cir. 2007); *Salmonese*, 352 F.3d at 622; *United States v. Smith*, 197 F.3d 225, 229 (6th Cir. 1999). "Superseding indictments have been deemed timely when they simply added detail to the original charges, narrowed rather than broadened the charges, contained amendments as to form but not substance, or were otherwise trivial or innocuous." *United States v. Ben Zvi*, 168 F.3d 49, 54 (2d Cir. 1999).

The original indictment in this case alleged that Yielding violated the anti-kickback statute by aiding and abetting the payment of eighteen checks to Wall to induce Wall to order "allograft bone from Osteotech." The original indictment also

charged Yielding with several counts of mail fraud based on payments made to Wall in exchange for Wall's agreement to order Orthofix bone growth stimulators. Count one of the second superseding indictment alleged that Yielding had violated the anti-kickback statute by aiding and abetting the same eighteen payments listed in the original indictment, but added that the payments were to induce Wall to order Orthofix bone growth stimulators as well as "bone from Osteotech." The second superseding indictment did not contain any mail fraud charges. Yielding argues that count one of the second superseding indictment substantially broadened the original charges by adding a reference to Orthofix bone growth stimulators in the anti-kickback count and by removing the term "allograft."

We conclude that count one of the second superseding indictment did not substantially broaden or amend the charges in the original indictment. Both indictments contained identical allegations that Yielding aided and abetted eighteen specific payments to induce Wall to order products distributed by Kelley Yielding. The original charges fairly alerted Yielding that he would be called to account for certain activities – namely, the eighteen payments to Wall – and that he should prepare a defense. *See McMillan*, 600 F.3d at 444-45; *United States v. Grady*, 544 F.2d 598, 601-03 (2d Cir. 1976). The mail fraud charges in the original indictment also provided Yielding with explicit notice that the Orthofix purchases would be at issue. The second superseding indictment actually narrowed the charges against Yielding by dropping the mail fraud counts and combining the Osteotech and Orthofix product purchases into a single anti-kickback count. We see no reason to conclude that the removal of the word "allograft" was anything more than a trivial alteration of the indictment. We therefore hold that count one of the second superseding indictment related back to the original indictment and was timely under 18 U.S.C. § 3282(a).

-15-

V.

Yielding argues that the district court erred by refusing to hold an evidentiary hearing on his motion to suppress statements and to declare his proffer agreement unenforceable. We review a district court's decision whether to hold an evidentiary hearing for an abuse of discretion. *United States v. Roberson*, 439 F.3d 934, 940 (8th Cir. 2006).

A.

Prior to trial, Yielding filed a motion to suppress statements he made during his interview with the FBI on April 14, 2006. Yielding asserted that his statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and requested an evidentiary hearing. The motion to suppress asserted that federal agents contacted and interrogated Yielding in April 2006, that Yielding was a target of the agents' investigation, and that the agents who conducted the interrogation failed to advise Yielding of the warnings required by *Miranda*. The district court denied the motion to suppress without a hearing, reasoning that "Yielding has not provided any facts in support of his argument that his statement should be suppressed." Yielding argues that the refusal to hold an evidentiary hearing violated his rights under the Due Process Clause of the Fifth Amendment.

A district court presented with a motion to suppress need not hold an evidentiary hearing as a matter of course, and a hearing is unnecessary if the district court can determine that suppression is unwarranted as a matter of law. *United States v. Mims*, 812 F.2d 1068, 1073-74 (8th Cir. 1987). *Miranda*'s requirements apply only to interrogations of suspects who are in custody. 384 U.S. at 44. A suspect is "in custody" for purposes of *Miranda* when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation omitted). In his motion,

Yielding did not assert that he was in custody at the time of the interrogation, and he did not allege any facts that would support a determination that he was in custody. Denial of the motion to suppress was therefore appropriate as a matter of law, and no evidentiary hearing was required.[2]

B.

On November 16, 2006, Yielding entered into a proffer agreement with the government. The agreement provided that the content of Yielding's proffer could not be used against him in a criminal proceeding, except as impeachment or rebuttal evidence, or as the basis of a prosecution for "perjury, false statements, or obstruction." The agreement also stated that "[t]he government may make derivative use of, and may pursue investigative leads suggested by, any statements or information provided by you [*sic*] proffer." Yielding's proffer concerned the Yieldings' business dealings with Dr. Patrick Chan, an Arkansas neurosurgeon who was under investigation in a separate case.

Prior to trial, Yielding moved for an order declaring the proffer agreement unenforceable or, in the alternative, striking portions of the agreement that authorized the government to use the proffered statements against Yielding in certain circumstances. He argued in part that he did not voluntarily enter into the proffer agreement. Yielding also requested a hearing on the motion. The district court denied the motion without a hearing, concluding that Yielding "has presented no evidence"

---

[2]After the district court denied the motion to suppress, Yielding moved to make a record of evidence that he would have presented in an evidentiary hearing. The district court granted the motion, but observed that the motion failed to present "any specific, detailed facts" in support of his motion to suppress, and did not include an affidavit from the defendant. Yielding did not ask the district court to reconsider its decision on the motion to suppress, and there was no error in the court's failure to do so *sua sponte* based on the general statements in the motion to make a record.

to support his motion.  Yielding now argues that the refusal to hold an evidentiary hearing violated the Due Process Clause of the Fifth Amendment.

We need not decide whether a hearing was necessary, because any error was harmless.  *See* Fed. R. Crim. P. 52(a).  Yielding concedes that the government did not use any of the proffered statements at trial.  His contention is that if he had been permitted to establish at a hearing that his proffer agreement was involuntary, then the government would have been required to prove that it made no derivative use of the proffered statements, and that all evidence against Yielding was derived from independent sources.  *See Kastigar v. United States*, 406 U.S. 441, 460-61 (1972).  Yielding's proffer, however, concerned an entirely separate case that focused on the activities of a doctor who had no involvement in the matters that formed the basis for Yielding's own prosecution.  The proffer took place several months after the FBI obtained the promissory note, financial records, and interview statements that were the foundation of Yielding's prosecution.  Yielding points to no evidence presented at trial that may have been derived from his proffer.  Yielding therefore suffered no prejudice from the denial of an evidentiary hearing.

VI.

Jack Lassiter and Erin Cassinelli Couch represented Kelley Yielding in 2006 in connection with the federal investigation into the payments from ANI to Wall.  This representation apparently lasted until Kelley's death in October 2006.  On March 18, 2009, Yielding served Lassiter with a subpoena requiring his presence at trial and requiring him to produce his entire file regarding the representation of Kelley Yielding.  *See* Fed. R. Crim. P. 17.

Lassiter and Couch moved to quash the subpoena pursuant to Federal Rule of Criminal Procedure 17(c)(2).  The attorneys argued that their file contained "significant amounts" of information protected by the attorney-client privilege and the

-18-

work-product doctrine, including communications between Kelley Yielding and Couch. The district court granted the motion in part, ruling that Lassiter and Couch were not required to produce any documents or to testify about any matters that they contended were protected by the attorney-client privilege or work-product doctrine.

Yielding argues that, as the personal representative of Kelley Yielding's estate, he holds Kelley's attorney-client privilege and can waive that privilege at will. He also contends that due process considerations require a waiver of Kelley's attorney-client privilege. It is not clear whether Lassiter and Couch withheld any documents based on the attorney-client privilege that were not also covered by the work-product doctrine, and Yielding does not challenge the district court's ruling on work product. But even assuming there is not complete overlap, for the reasons that follow, we see no abuse of discretion in the district court's decision to quash the subpoena.

In the absence of a relevant federal rule, statute, or constitutional provision, federal common law governs questions of privilege in federal criminal proceedings. Fed. R. Evid. 501; *United States v. Espino*, 317 F.3d 788, 795 (8th Cir. 2003). "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). This privilege protects confidential communications between a client and her attorney made for the purpose of facilitating the rendition of legal services to the client. *United States v. Horvath*, 731 F.2d 557, 561 (8th Cir. 1984). The privilege belongs to and exists solely for the benefit of the client. *Henderson v. United States*, 815 F.2d 1189, 1192 (8th Cir. 1987).

In *Swidler & Berlin v. United States*, 524 U.S. 399, 410 (1998), the Supreme Court recognized that the attorney-client privilege generally survives the death of a client. Proposed Federal Rule of Evidence 503, which this court has described as "a useful starting place for an examination of the federal common law of attorney-client privilege," *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 915 (8th Cir.

-19-

1997) (internal quotation omitted), provided that the attorney-client privilege could be claimed by the personal representative of a deceased client. Proposed Fed. R. Evid. 503(c), *reprinted in* 56 F.R.D. 183, 236 (1972). Other authorities likewise have recognized that a client's personal representative may invoke and waive the client's attorney-client privilege after the client's death. *See* Restatement (Third) of the Law Governing Lawyers § 86(1)(a); Unif. R. Evid. 502(c).

A personal representative of a deceased client generally may waive the client's attorney-client privilege, however, only when the waiver is in the interest of the client's estate and would not damage the client's reputation. *See* 8 Wigmore, Evidence § 2329 (McNaughton rev. 1961); 81 Am. Jur. 2d *Witnesses* § 335; E.S. Stephens, Annotation, *Waiver of Attorney-Client Privilege by Personal Representative or Heir of Deceased Client or by Guardian of Incompetent*, 67 A.L.R.2d 1268, § 1 (2009). The cases that have considered this question in detail recognize that a posthumous waiver must be in the interest of the deceased client's estate. *See, e.g.*, *Dist. Attorney for the Norfolk Dist. v. Magraw*, 628 N.E.2d 24, 26-27 (Mass. 1994); *Eicholtz v. Grunewald*, 21 N.W.2d 914, 916-17 (Mich. 1946); *Mayorga v. Tate*, 752 N.Y.S.2d 353, 356 (N.Y. App. Div. 2002) (per curiam) (collecting cases). This rule furthers the purposes of the attorney-client privilege by reducing uncertainty about the privilege's posthumous application and encouraging "full and frank" discussions between clients and their attorneys. *See Swidler & Berlin*, 524 U.S. at 409-10.

Yielding acknowledges that he sought to waive Kelley Yielding's attorney-client privilege in order to use the privileged communications against Kelley's interest. He wanted to impeach any of her statements introduced by the government, *see* Fed. R. Evid. 806, and to admit statements against her penal interest for the purpose of inculpating Kelley and exculpating himself. *See* Fed. R. Evid. 804(b)(3). Although the proposed waiver would not be in the interest of the decedent's estate, Yielding argues that Kelley already was implicated in the government's investigation and thus could not suffer further reputational harm as a result of a waiver. We are

unconvinced. An admission by Kelley Yielding of complicity in a kickback scheme – if she made such an admission to her attorneys – could do far more damage to Kelley's reputation than a mere investigation.

Yielding also contends that due process considerations require a waiver of Kelley's privilege. Yielding did not raise this argument before the district court, so we review only for plain error. *See* Fed. R. Crim. P. 52(b). We conclude that Yielding has not shown plain error, because he established neither an obvious error nor a reasonable probability that the outcome would have been different absent the alleged error. *See United States v. Olano*, 507 U.S. 725, 732 (1993). The Supreme Court in *Swidler & Berlin* merely acknowledged the possibility that "exceptional circumstances implicating a criminal defendant's constitutional rights *might* warrant breaching the privilege." 524 U.S. at 408 n.3 (emphasis added). The law does not clearly establish that due process requires such a breach. And even if Kelley Yielding had made inculpatory statements to her attorneys, it is unlikely that such statements would have swayed the outcome of Yielding's trial, given the strong evidence that Yielding himself played a central role in the kickback scheme and cover-up. There was no plain error warranting relief.

VII.

Yielding objects to certain aspects of the district court's jury instructions regarding count one, the anti-kickback charge. We review a district court's formulation of jury instructions for an abuse of discretion, and we will reverse only if an error in the instructions was prejudicial. *United States v. White Calf*, 634 F.3d 453, 456 (8th Cir. 2011).

A.

Yielding argues that the jury instructions improperly defined the word "willfully," as that term is used in the anti-kickback statute. The statute requires the government to prove that the defendant "knowingly and willfully" offered or paid remuneration to a person to induce that person to purchase goods or items for which payment may be made under a federal health care program. 42 U.S.C. § 1320a-7b(b)(2). The district court instructed the jury that "[a] defendant acts willfully if he knew his conduct was wrongful or unlawful." In *United States v. Jain*, 93 F.3d 436 (8th Cir. 1996), this court held that the anti-kickback statute requires "*proof that [the defendant] knew that his conduct was wrongful*, rather than proof that he knew it violated a known legal duty." *Id.* at 441 (emphasis added) (internal quotation omitted). The court upheld an instruction providing that "the word 'willfully' means unjustifiably and wrongfully, known to be such by the defendant" and that "good faith" was a defense to the charge. *Id.* at 440 (internal quotation omitted). The court's instruction in this case was consistent with *Jain*.

Yielding complains that because the district court defined "willfully" in the disjunctive – requiring that the defendant knew his conduct was wrongful *or* unlawful – "there is no way to tell whether the jurors were unanimous in their selection." Yielding did not object to the instruction on this basis, and we conclude that there was no plain error. *See* Fed. R. Crim. P. 52(b). The district court repeatedly instructed the jury that its verdict had to be unanimous, and such a general unanimity instruction is "usually sufficient to protect a defendant's Sixth Amendment right to a unanimous verdict." *United States v. Lalley*, 257 F.3d 751, 756 (8th Cir. 2001). There was nothing special about this case that required the district court, without objection by the defendant, to give a specific unanimity instruction. *See United States v. James*, 172 F.3d 588, 593 (8th Cir. 1999).

B.

Yielding also argues that the district court's instructions regarding the anti-kickback statute constructively amended the indictment. Count one of the second superseding indictment alleged that Yielding aided and abetted payments to Wall "for the purpose of inducing Wall to arrange for the order and purchase" of products distributed by Kelley Yielding. The district court instructed the jury that it should find Yielding guilty if the government proved, among other elements, that "the checks were paid primarily in order to induce Jody Wall to arrange for the order and purchase" of Kelley Yielding's products. Yielding's reasoning is unclear, but he appears to object to the inclusion of the word "primarily" in the jury instructions.

A jury instruction constructively amends the indictment if it alters the essential elements of the offense charged in the indictment and thereby creates a "substantial likelihood" that the defendant was convicted of an uncharged offense. *United States v. Buchanan*, 574 F.3d 554, 564 (8th Cir. 2009). The addition of the term "primarily" in the jury instructions did not create such a likelihood. The indictment alleged that portions of each payment were made to induce Wall to order Kelley's products, and the instruction simply informed the jurors that they need not find that such an inducement was the *sole* purpose of the payments. We therefore reject Yielding's constructive amendment claim.[3]

_____

[3]Yielding briefly asserts that the district court's instructions did not require the jury to find that he intended to induce Wall to order Kelley Yielding's products. The instructions, however, required the jury to find that Yielding knowingly and willfully paid remuneration in the form of checks *and* that the checks were paid primarily to induce Wall to arrange orders and purchases of Kelley's products. R. Doc. 93, at 8. This formulation was not an abuse of discretion.

-23-

C.

Yielding's next objection concerns the district court's refusal to issue a proposed theory-of-defense instruction. This court often has said that "[a] defendant has a right to have an instruction read reflecting his or her theory of the case, provided that the request is made in time and that the instruction is supported by the evidence and correctly states the law." *United States v. Hoffmann*, 556 F.3d 871, 874 (8th Cir. 2009) (internal quotation omitted). But a defendant is not entitled to such an instruction "where the instructions given adequately and correctly cover the substance of the requested instruction." *Id.* at 874-75 (internal quotation omitted).

Yielding asserts that his theories of defense on count one were that: (1) the purpose of the payments was not to influence Wall to order the products at issue; (2) Yielding's hopes, expectations, or beliefs were insufficient to sustain a conviction under the anti-kickback statute; (3) Wall was paid as an agent or employee of ANI; and (4) Yielding could be convicted only if he knew that his conduct violated a known legal duty. The first three theories were adequately reflected in the district court's instructions concerning the purpose requirement of the anti-kickback statute. The fourth theory was an inaccurate description of the law as established in *Jain*, 93 F.3d at 441, and Yielding therefore had no right to such an instruction.

D.

Yielding's final challenge to the jury instructions on count one concerns the district court's refusal to give the jury an instruction regarding Jody Wall's mental capacity. Yielding asked the court to instruct the jury that if it believed Wall's memory was faulty due to a mental defect, it should "give his testimony such weight[,] if any, [as] you think it deserves in light of these facts." The district court declined to give this instruction, and instead gave the jurors a detailed instruction regarding their duty to weigh testimony and decide issues of credibility generally. The district

-24-

court's refusal to highlight the defense's arguments concerning the credibility of a single witness was not an abuse of discretion. *See United States v. Moore*, 786 F.2d 1308, 1315-16 (5th Cir. 1986).

VIII.

Yielding raises several challenges to his conviction on count two for violating 18 U.S.C. § 1519, an obstruction of justice statute. Section 1519 was enacted as part of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 802(a), 116 Stat. 745, 800, which tightened regulation of the accounting industry and instituted new penalties for fraud and obstruction of justice following "a series of celebrated accounting debacles." *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3147 (2010). The section provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519. The charge in this case was based on Yielding's knowing falsification of a promissory note with the intent to disguise checks paid from ANI to Wall as "loans" rather than kickbacks.

A.

Yielding's narrowest challenge is to the district court's jury instructions on the § 1519 charge. The district court instructed the jury as follows:

The crime of falsifying a document as charged in Count Two of the indictment, has three essential elements, which are:

One, the defendant knowingly falsified a document;

Two, the defendant did so with the intent to impede, obstruct, or influence the investigation or proper administration of any matter or in contemplation of or relation to any such matter; and

Three, the matter was within the jurisdiction of the United States Department of Health and Human Services which is an agency of the United States.

If all of these essential elements have been proved beyond a reasonable doubt as to the defendant then you must find the defendant guilty of the crime charged under Count Two; otherwise you must find the defendant not guilty of this crime under Count Two.

The United States does not have to prove that the matter be pending at the time of the obstruction, but only that the acts be taken in relation to or contemplation of any such matter or case.

Further, the United States does not have to prove that the falsifying of the document would naturally or probably result in obstruction.

In order to meet its burden, the United States need not prove that the defendant specifically knew that the matter was within the jurisdiction of a department or agency.

R. Doc. 93, at 11.

Yielding renews objections lodged in the district court regarding the elements of the offense. To resolve the challenges to the instructions, therefore, we must consider what proof is required to establish a violation of § 1519.

-26-

One element on which both parties agree is that the government must prove that Yielding "knowingly . . . falsifie[d] . . . any . . . document." The falsification must be done knowingly; an unwitting falsehood will not suffice.

The element of intent is more complex. The statute provides that liability may arise in three different situations involving matters within the jurisdiction of a federal department or agency: (1) when a defendant acts directly with respect to "the investigation or proper administration of any matter," that is, a pending matter, (2) when a defendant acts "in . . . contemplation of any such matter," and (3) when a defendant acts "in relation to . . . any such matter." Although the phrasing of the statute is a bit awkward, the government concedes that the prosecution must show intent to impede, obstruct, or influence the investigation or proper administration of a matter in each of these three scenarios. Appellee's Br. 44, 47. We think this is the better reading of the statute. The phrase "or in relation to or contemplation of any such matter" is set off by commas and follows the reference to an accused's intent to obstruct the investigation of "any matter." It seems to us that Congress thereby sought to extend the prohibition to situations in which the accused does not act directly with respect to a pending matter, but acts either in contemplation of a future matter or in relation to a pending matter. The statute, for example, does not allow a defendant to escape liability for shredding documents with intent to obstruct a foreseeable investigation of a matter within the jurisdiction of a federal agency just because the investigation has not yet commenced.

But we do not think Congress, in expanding the scope of § 1519 beyond actions directed to a pending matter, eliminated the need for proof of intent to impede, obstruct, or influence a federal matter. In other words, the statute does not impose liability for "knowingly . . . destroy[ing] . . . any . . . document . . . in . . . contemplation of any [federal] matter," *without* an intent to impede, obstruct, or influence a matter. If it did, then the statute would forbid innocent conduct such as routine destruction of documents that a person consciously and in good faith

-27-

determines are irrelevant to a foreseeable federal matter. We thus understand the intent element of the statute to encompass three possible scenarios: (1) a defendant acts with intent to impede, obstruct, or influence the investigation or proper administration of a federal matter, (2) a defendant, in contemplation of a federal matter, acts with intent to impede, obstruct, or influence the investigation or proper administration of the matter, and (3) a defendant, in relation to a federal matter, acts with intent to impede, obstruct, or influence the investigation or proper administration of the matter. *See United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008).

The parties disagree, however, about whether the intent element of § 1519 also requires what the Supreme Court has described as a "nexus" between the alleged obstructive act and the federal matter. Yielding contends that the government was required to prove not only that he intended to impede, obstruct, or influence the investigation or proper administration of a matter, but also that he knew that his actions would have the "natural and probable effect" of interfering with the investigation or proper administration of a matter. He objects that the district court erred by instructing the jury that the government need not "prove that the falsifying of the document would naturally or probably result in obstruction."

The proposed "nexus" requirement is derived from *United States v. Aguilar*, 515 U.S. 593 (1995), and *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). In *Aguilar*, the Court considered 18 U.S.C. § 1503, which forbid "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice." In evaluating "the very broad language of the catchall provision," the Court explained first that "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings," not merely some ancillary proceeding. 515 U.S. at 599. The Court then inferred an additional requirement that the "endeavor" of the accused must have the "natural and probable effect" of interfering with the due administration of justice: "[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *Id.*

-28-

In *Arthur Andersen*, the Court addressed 18 U.S.C. § 1512(b), which prohibited "knowingly . . . corruptly persuad[ing]" another person, with an intent to cause that person to withhold documents from, or alter documents for use in, an official proceeding. Although § 1512 provided that an official proceeding "need not be pending or about to be instituted at the time of the offense," the Court nonetheless construed the statute to require the "nexus" discussed in *Aguilar*. The opinion reasoned that "[a] 'knowingly . . . corrup[t] persaude[r]' cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material." 544 U.S. at 708 (second and third alterations in original).

*Aguilar* and *Arthur Andersen* relied on the Court's traditional exercise of restraint in assessing the reach of federal criminal statutes, "both out of deference to the prerogatives of Congress, and out of concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" *Aguilar*, 515 U.S. at 600 (citations omitted) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). Presented with a dissent in *Aguilar* that deemed an accused's intent to obstruct sufficient to impose liability, without need for a "natural and probable effect" on an official proceeding, *id.* at 612-13 (Scalia, J., dissenting), the Court responded that an accused's culpability in that situation "is a good deal less clear from the statute than we usually require in order to impose criminal liability." *Id.* at 602.

We conclude that the "nexus" requirement urged by Yielding – that the government must show the accused knew his actions were likely to affect a federal matter – does not apply to a prosecution for the knowing falsification of documents under § 1519. The text of § 1519 requires only proof that the accused knowingly committed one of several acts, including falsification of a document, and did so "with the intent to impede, obstruct, or influence the investigation or proper administration" of a federal matter. The requisite knowledge and intent can be present even if the

accused lacks knowledge that he is likely to succeed in obstructing the matter. It presumably will be easier to prove that an accused intended to obstruct an investigation if the obstructive act was likely to affect the investigation. But we do not think the statute allows an accused with the requisite intent to avoid liability if he overestimated the importance of a falsified record or shredded a document for the purpose of eliminating a small but appreciable risk that the document would lead investigators to discover his wrongdoing.

The language of § 1519 is materially different from the statutes considered in *Aguilar* and *Arthur Andersen*. The former forbade "corruptly endeavor[ing]" to obstruct, and the latter prohibited "knowingly corrup[t] persau[sion]." In both cases, the Court was thus required to discern the substance of an intent requirement from statutory terms that appeared to imply one, but did not speak directly to its content. Exercising restraint based on concerns about fair warning and deference to Congress, the Court required proof that the accused knew of a "natural and probable effect" on a federal proceeding to establish an intent to obstruct.

But in § 1519, Congress spoke more directly to the requisite intent and described its scope more precisely. The statute includes no ambiguous phrase such as "corruptly endeavor" or "knowingly corruptly persuade" that calls for implication of an additional intent requirement. At some point, "deference to the prerogatives of Congress," *Aguilar*, 515 U.S. at 600, means that Congress has the right to enact a statute of substantial breadth, and restraint in assessing the reach of criminal statutes must give way to restraint in fashioning elements shunned by Congress in the statutory text. We think the text of § 1519 gives fair warning that knowingly falsifying a document, in contemplation of a federal matter, with intent to impede, obstruct, or interfere with that matter may result in criminal liability, whether or not the obstruction was likely to succeed. That the accused's intent must be wrongful is evident from the nature of the acts prohibited, such as knowing falsification of documents, and the requisite intent to influence, obstruct, or impede an investigation

or proper administration of a federal matter.  *United States v. Stevens*, 771 F. Supp. 2d 556, 561 (D. Md. 2011); *cf. Aguilar*, 515 U.S. at 617 (Scalia, J., dissenting).  The jury instruction was therefore not erroneous, because § 1519 does not require a nexus of the kind articulated in *Aguilar* and *Arthur Andersen*.  *See United States v. Gray*, 642 F.3d 371, 377-78 (2d Cir. 2011).[4]

Yielding also maintains that the knowledge requirement of § 1519 means that the government was required to prove that Yielding knew the "matter" at issue was within the jurisdiction of a department or agency of the United States.  The district court disagreed and instructed the jury that the government "need not prove that the defendant specifically knew that the matter was within the jurisdiction of a department or agency."

We conclude that the district court's instruction accurately stated the law on this point as well.  The most natural grammatical reading of the statute is that the term

---

[4]Courts have differed on whether the relevant legislative history suggests a "nexus" requirement.  The Senate committee report on § 1519 cited *Aguilar* and said that other obstruction-of-justice provisions, such as § 1503, "have been narrowly interpreted . . . to apply only to situations where the obstruction of justice can be closely tied to a pending judicial proceeding."  S. Rep. No. 107-146, at 14-15 (2002).  The report continued that § 1519 is "meant to apply broadly," and "specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter." *Id*.  The Second Circuit thought this history supported its view that the "same nexus requirement" described in *Aguilar* and *Arthur Andersen* does not apply to § 1519.  *See Gray*, 642 F.3d at 377-78.  A recent district court opinion thought the legislative history "defeated" the government's argument against applying the "nexus" requirement from *Aguilar* and *Arthur Andersen*.  *United States v. Moyer*, 726 F. Supp. 2d 498, 506 (M.D. Pa. 2010).  We observe that the history does not address directly whether an accused must know that his act will have the "natural and probable effect" of impeding a federal matter, but it does speak generally to the desire for a "broad" statute and elimination of what the committee viewed as "technical" requirements that "narrowed" other obstruction of justice statutes.

"knowingly" in § 1519 modifies only the surrounding verbs: "alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry." The Supreme Court sometimes has applied "knowingly" more broadly (and unnaturally) in a criminal statute to avoid anomalies and constitutional problems, or where scienter is not otherwise expressed. *See, e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69-70 (1994). Those concerns are not present here. The statute requires proof that an accused *knowingly* falsified a document, with *intent* to impede, obstruct, or interfere with the investigation or proper administration of a matter. It is sufficient that the "matter" is within the jurisdiction of a federal agency as a factual matter. *See United States v. Cooper*, 482 F.3d 658, 664-65 (4th Cir. 2007) ("It is well settled that mens rea requirements typically do not extend to the jurisdictional elements of a crime – that 'the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute.'") (quoting *United States v. Feola*, 420 U.S. 671, 677 n.9 (1975)); *see also United States v. Yermian*, 468 U.S. 63, 68-69 (1984); *United States v. Rehak*, 589 F.3d 965, 974-75 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 2130 (2010). This understanding of § 1519 is consistent with the relevant legislative history. *See* S. Rep. No. 107-146, at 15 (2002) ("Destroying or falsifying documents to obstruct any of these types of matters or investigations, which *in fact* are proved to be within the jurisdiction of any federal agency are covered by this statute.") (emphasis added); 148 Cong. Rec. S7419 (daily ed. July 26, 2002) (statement of Sen. Leahy) ("The fact that a matter is within the jurisdiction of a federal agency is intended to be a jurisdictional matter, and not in any way linked to the intent of the defendant.").

Yielding also asserts that the jury instructions were deficient because they did not define the phrase "in contemplation of." A district court, however, need not define terms that have a common usage and understanding. *United States v. Rice*, 449 F.3d 887, 895 (8th Cir. 2006); *United States v. Whitehead*, 176 F.3d 1030, 1040 (8th Cir. 1999). "Contemplation" is commonly understood as "an act of the mind in considering with attention," as well as "the act of looking forward to an event" and

"the act of intending or considering a future event." *Webster's Third New International Dictionary* 491 (2002). The jury instruction also clarified the meaning of the term through juxtaposition: the jury was advised that the government need not prove that the matter was "pending at the time of obstruction," but only that the accused's acts were "taken in . . . contemplation of any such matter." R. Doc. 93, at 11. A reasonable jury thus would understand the phrase "in contemplation of" to refer to a matter that was not yet pending but which the defendant envisioned or anticipated. No further definition was required.[5]

## B.

Yielding also moved unsuccessfully to dismiss the indictment on the ground that § 1519 is impermissibly vague in violation of the Due Process Clause of the Fifth Amendment. We review such constitutional challenges *de novo*. *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009). "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718 (2010) (internal quotation omitted). "We consider whether a statute is vague as applied to the particular facts at issue, for [a] plaintiff

---

[5]Yielding briefly argues that the jury instructions on the § 1519 charge deprived him of his Sixth Amendment right to a unanimous verdict because they were phrased in the disjunctive, and that the instructions constructively amended the indictment by "permitting the jury to convict Yielding if they found that he participated in the falsification of the document instead of doing so 'in relation to and in contemplation of an investigation in the proper administration within the jurisdiction of HHS.'" Yielding did not raise these objections at trial, and there was no obvious error. The district court's general unanimity instruction was sufficient to satisfy the Sixth Amendment, *see James*, 172 F.3d at 593, and the instructions regarding count two tracked the language of the statute and indictment. *See United States v. Slaughter*, 128 F.3d 623, 628-29 (8th Cir. 1997).

who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 2718-19 (internal quotation omitted) (alteration in original).

We conclude that § 1519 is not unconstitutionally vague as applied to Yielding. The text of the statute provided Yielding with fair notice that his particular conduct fell within the scope of § 1519. The plain language of the statute forbids the knowing falsification of a document with the intent to impede, obstruct, or influence the investigation or proper administration of a federal matter, even if that matter is not pending at the time of the obstructive act. A person of ordinary intelligence would understand that falsification of the promissory note in the circumstances of this case qualifies as prohibited conduct. *See Hunt*, 526 F.3d at 743.

## C.

Yielding also challenges the sufficiency of the evidence supporting his conviction under § 1519. We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the jury verdict and making all reasonable inferences in support of the verdict. *United States v. Birdine*, 515 F.3d 842, 844 (8th Cir. 2008). We will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

Yielding contends that the evidence was insufficient because no reasonable jury could conclude that he contemplated an investigation by a federal agency. The government presented two theories supporting a § 1519 conviction at trial. Only one theory required the government to prove that Yielding acted in contemplation of a future federal matter; the jury instructions also permitted the jury to convict Yielding by finding that he intended to obstruct the proper administration of a *pending* matter, namely, the provision of products to Medicare patients. Yielding does not appear to challenge the sufficiency of evidence to sustain a conviction under the latter theory,

-34-

and sufficiency on one of the theories is enough to sustain the conviction. *See United States v. Papakee*, 573 F.3d 569, 574 (8th Cir. 2009).

In any event, sufficient evidence supports a finding that Yielding acted in contemplation of a matter, with the intent to impede, obstruct, or influence an investigation of such matter, and that the matter was within the jurisdiction of a federal department. The evidence included an e-mail stating that Baptist was conducting an internal investigation into purchasing irregularities involving Orthofix products. The e-mail was forwarded to Yielding less than a week before he directed Wall to sign the check from U.S. Bank, which appeared to repay a loan from the Yieldings to Wall. Wall testified that Yielding gave him a promissory note to sign in approximately December 2004, and told him to fill out the "Dated" field as if he were signing the note in January 2004. Wall also testified that Yielding indicated that they needed to cover up the kickbacks to avoid getting in trouble. There was also evidence that Yielding specifically contemplated a federal investigation into his activities. Wall testified that Yielding told him in the early stages of the kickback scheme that they would focus on purchasing products for patients covered by private insurance, rather than Medicare.

Based on this evidence, a reasonable jury could conclude that the e-mail notified Yielding about Baptist's internal investigation, that Yielding feared that the inquiry at the hospital would uncover the illicit payments and lead to an investigation by law enforcement or regulators, and that Yielding therefore designed a scheme to cover up the kickbacks and thwart such an investigation. The jury also reasonably could infer that Yielding originally sought to avoid billing Medicare for the supplies so that his activities would escape the scrutiny of federal investigators. The investigation that arose concerned a matter within the jurisdiction of the United States Department of Health and Human Services. The evidence was sufficient to support Yielding's conviction under § 1519.

Yielding raises several challenges to his sentence. In reviewing a defendant's sentence, our first task is to ensure that the district court committed no significant procedural error, such as improperly calculating the guideline range. *Gall v. United States*, 552 U.S. 38, 51 (2007). We review a district court's interpretation and application of the sentencing guidelines *de novo* and its findings of fact for clear error. *United States v. Gallimore*, 491 F.3d 871, 874-75 (8th Cir. 2007).

A.

Yielding first contends that the district court incorrectly applied the advisory guidelines concerning amount of loss. The district court determined that the applicable guideline was USSG § 2B4.1, which establishes a base offense level of 8. That provision then states:

> If the greater of the value of the bribe or the improper benefit to be conferred (A) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (B) exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

USSG § 2B4.1(b)(1). The district court found that Yielding's conduct had caused a total loss to the victims of $1,485,590.30, and that the total benefit to Yielding was $383,734.88. Applying § 2B4.1(b)(1), the district court turned to the table in § 2B1.1(b)(1), which provides for a sixteen-level increase in the defendant's offense level for an amount greater than $1 million but less than $2.5 million. Using the total loss figure of $1,485,590.30, the court increased Yielding's base offense level by sixteen levels.

Yielding contends that the district court erred by using the amount of loss to the victims, rather than the amount of the improper benefit conferred on Yielding, and we agree. Section 2B4.1(b)(1) directs the court to use "the greater of the value of the bribe or the improper benefit to be conferred," *not* the amount of loss to victims, when increasing the offense level through the table in § 2B1.1. The commentary to § 2B4.1 provides that the "value of the improper benefit to be conferred" is "the value of the action to be taken or effected in return for the bribe." USSG § 2B4.1, comment. (n.2); *see also id.*, comment. (backg'd.) ("The base offense level is to be enhanced based upon the value of the unlawful payment or the value of the action to be taken or effected in return for the unlawful payment, whichever is greater."). Because the value of the improper benefit to Yielding exceeded the value of the payments to Wall, the district court should have used the amount of the improper benefit conferred on Yielding in return for the kickbacks – $383,734.88 – when applying § 2B4.1(b)(1). The amount of loss to the victims, central to the guideline calculation in a fraud case under § 2B1.1 (and former § 2F1.1), is not the focus of this guideline. *United States v. Fitzhugh*, 78 F.3d 1326, 1331 (8th Cir. 1996); *United States v. Montani*, 204 F.3d 761, 770 (7th Cir. 2000). We therefore conclude that there was procedural error, and that Yielding's sentence must be vacated.

B.

Yielding argues that the district court's imposition of a two-level adjustment for obstruction of justice, pursuant to USSG § 3C1.1, constituted impermissible double-counting and violated the Double Jeopardy Clause of the Fifth Amendment. "Double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Myers*, 598 F.3d 474, 476 (8th Cir. 2010) (internal quotation omitted). Yielding's two offenses were "grouped" pursuant to USSG § 3D1.2(c), and the court determined a single offense level for the group under the advisory guidelines. Section 3D1.2(c) requires grouping

"[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts."

When an obstruction of justice offense is grouped with an underlying offense, the offense level for the grouped offense is the offense level for the underlying offense increased by the two-level obstruction adjustment under § 3C1.1, or the offense level for the obstruction of justice offense, whichever is greater. USSG § 3C1.1, comment. (n.8). This rule is designed to prevent double-counting by ensuring that the obstructive conduct is taken into account only once: as a two-level adjustment to the base offense level for the underlying offense, or as the offense level provided for the obstruction offense itself. *See id.* § 3D1.2, comment. (n.5). Here, the district court followed the grouping provisions by imposing a two-level obstruction-of-justice adjustment to the base offense level for the underlying anti-kickback statute offense. There was thus no double-counting of the obstructive conduct. Because Yielding has not shown that the district court imposed multiple punishments for the same offense, there was no violation of the Double Jeopardy Clause. *See Witte v. United States*, 515 U.S. 389, 401-02 (1995); *United States v. Grisanti*, 116 F.3d 984, 987-88 (2d Cir. 1997).[6]

---

[6]Given that the case must be remanded for resentencing, we do not reach Yielding's argument that the district court violated the Ex Post Facto Clause by applying a version of § 3C1.1 that was promulgated after the date of the offense. *See* U.S. Const. art. I, § 9. The district court and the parties devoted little attention to the issue, which remains unsettled in this circuit, *see United States v. Deegan*, 605 F.3d 625, 632 (8th Cir. 2010), *cert. denied*, 131 S. Ct. 2094 (2011), and the district court could impose a sentence on remand that would make it unnecessary to resolve the question. We therefore think it prudent to avoid reaching the issue at this juncture. *See United States v. Matthews*, 5 F.3d 1161, 1164 (8th Cir. 1993).

C.

The district court increased Yielding's offense level by two levels, pursuant to USSG § 3B1.1(c), because he was an organizer, leader, manager, or supervisor of the criminal activity at issue. A number of factors are relevant to the determination whether a role adjustment is warranted, including the degree of control and authority exercised over others. *United States v. Jackson*, 639 F.3d 479, 483 (8th Cir. 2011) (quoting USSG § 3B1.1, comment. (n.4)). Yielding asserts that the district court was required to find that Yielding exercised control over another participant in the criminal activity, and that there was insufficient evidence to support such a finding.

Even assuming that "control" is required, *cf. United States v. Gaines*, 639 F.3d 423, 428-29 & n.4 (8th Cir. 2011), there was ample evidence that Yielding qualified for an enhancement under § 3B1.1(c), including evidence that he exercised control over Wall. Wall testified that Yielding recruited him into the kickback scheme, told him to order bone products so that Kelley Yielding would receive a free vacation from her suppliers, and convinced him to sign a false promissory note and a cashier's check designed to make the kickbacks appear to be loans. The government presented financial records supporting Wall's version of events, along with admissions by Yielding that partially corroborated Wall's account. This evidence was sufficient to support the district court's finding that an upward adjustment was appropriate.

D.

Yielding's last argument is that the district court erred in ordering him to pay restitution. Federal courts may order restitution only when explicitly empowered to do so by statute. *United States v. Balentine*, 569 F.3d 801, 802 (8th Cir. 2009). The district court did not identify the basis for its award of restitution. The presentence report stated that an order of restitution was required by the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and the government argued at

sentencing that an order of restitution was mandatory. Yielding contends that the Act does not mandate restitution in this case, and that the district court's order of restitution must therefore be vacated.

The MVRA provides that a sentencing court "shall order" a defendant convicted of an offense identified in § 3663A(c) to pay restitution to the victim of the offense. *Id.* § 3663A(a)(1). Section 3663A(c) identifies three types of offenses that trigger mandatory restitution under the MVRA: (1) crimes of violence, as defined in 18 U.S.C. § 16; (2) offenses against property under Title 18 or 21 U.S.C. § 856(a), "including any offense committed by fraud or deceit"; and (3) offenses described in 18 U.S.C. § 1365. *Id.* § 3663A(c)(1)(A). The government argues that restitution was mandatory under the second category. Although the anti-kickback offense under 42 U.S.C. § 1320a-7b(b)(2) does not suffice, because it is not an offense under Title 18 or 21 U.S.C. § 856(a), the government argues that Yielding was convicted of a Title 18 offense as an aider and abettor of the anti-kickback offense, pursuant to 18 U.S.C. § 2.

The government's theory is unconvincing, because Yielding's conviction for aiding and abetting a Title 42 offense is a conviction under Title 42: "A fundamental theory of American criminal law is that there is no offense of aiding and abetting or accomplice liability as such. . . . Whether one is convicted as a principal or as an accomplice/aider and abettor, the crime of which he is guilty is the same: whatever is the underlying offense." *United States v. Baca-Valenzuela*, 118 F.3d 1223, 1232 (8th Cir. 1997) (italics omitted). 18 U.S.C. § 2 does not establish a separate offense, but rather imputes the actions of the principal to the aider and abettor as a matter of law. *United States v. Stands*, 105 F.3d 1565, 1577 (8th Cir. 1997). Yielding therefore did not qualify for a mandatory order of restitution pursuant to the MVRA, and the order of restitution must be vacated. *See United States v. Elias*, 269 F.3d 1003, 1021 (9th Cir. 2001); *United States v. Jewell*, No. 4:07-cr-00103, 2009 WL 1010877, at *12

-40-

(E.D. Ark. Apr. 15, 2009). *But cf. United States v. West Indies Transp., Inc.*, 127 F.3d 299, 315 (3d Cir. 1997).

The government contends that we should affirm the order of restitution on an alternative ground, because such an order was authorized by 18 U.S.C. § 3663 and could have been imposed as a condition of supervised release under 18 U.S.C. §§ 3583(d) and 3563(b)(2). The record, however, does not establish that the court exercised discretion to impose restitution as a condition of supervised release. It suggests instead that the district court mistakenly believed that restitution was mandatory. We therefore vacate the restitution order and remand for further proceedings on that issue. *United States v. Owens*, 901 F.2d 1457, 1459 (8th Cir. 1990).

\* \* \*

For the foregoing reasons, we affirm Yielding's convictions, vacate the sentence, and remand for further proceedings consistent with this opinion.

_____